J. S11003/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
v. :
:
TYREE JOHNSON, : No. 293 EDA 2015
:
Appellant :

Appeal from the Judgment of Sentence, September 14, 2012,
in the Court of Common Pleas of Philadelphia County
Criminal Division at Nos. CP-51-CR-0007956-2010,
CP-51-CR-0007971-2010, CP-51-CR-0007973-2010,
CP-51-CR-0007974-2010

BEFORE:  FORD ELLIOTT, P.J.E., OTT AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED APRIL 11, 2016**

Tyree Johnson appeals from the September 14, 2012 judgment of

sentence following his conviction of endangering the welfare of children,

indecent assault, corrupting the morals of a minor, simple assault, and

possession of an instrument of crime.  We affirm.

The trial court provided the following procedural and factual history of

this case:

> This is a direct ***nunc pro tunc*** appeal by the
> defendant, Tyree Johnson, from judgments of
> sentence entered on September 14, 2012, in four
> cases that were consolidated and tried nonjury on
> September 8 [and] 12, 2011.[Footnote 1]  The
> evidence showed that he had inflicted a pattern of
> abuse upon a women [sic] and her three minor
> children with whom he resided but to whom he was
> not related over the course of about three or four

years. He was convicted of three counts of Endangering the Welfare of a Child (EWOC) and one count each of Indecent Assault by Forcible Compulsion and on a Person Less Than Thirteen Years of Age, Corruption of the Morals of a Minor, Simple Assault and Possession of an Instrument of Crime.[Footnote 2] The last two were with regard to the mother and the rest with regard to the children. He was found not guilty on one count each of rape by forcible compulsion, statutory rape, rape of a child, unlawful contact with a minor, indecent exposure, aggravated assault, and false imprisonment, two counts each of unlawful restraint and unlawful contact with a minor, and three counts each of reckless endangerment, possessing an instrument of crime and simple assault. In summary, in 2003, he had met and began dating the woman and shortly thereafter moved into her home, and for the first one to two years, they all enjoyed a pleasantly congenial familial relationship. However, it thereafter evolved into an increasingly domineering and physically abusive one which included severe beatings of all of them and a sexual assault on one of the daughters and frequent sexual assaults on the other.

[Footnote 1] The others are at CP-51-CR-0007971, 0007973, & 0007974-2010. Separate appeals were filed for each of those cases at 294, 295 & 296 EDA 2015, but they were dismissed as duplicative.

[Footnote 2] *18 Pa.C.S. §§ 4304(a), 3126(a)(2), 3126(a)(7), 6301(a)(1); 2701(a), & 907(a).*

Following the verdicts, trial counsel was granted permission to withdraw and new counsel was appointed. The defendant was given terms aggregating to a maximum of five (5) years' confinement followed by five (5) years' probation. No post verdict or sentencing motions were filed and a timely appeal was filed but it was dismissed for

failing to file a brief.[Footnote 3] Present counsel filed a petition for relief under the Post Conviction Relief Act, *42 Pa.C.S. § 9541 **et seq.***, in which he claimed ineffective assistance of appellate counsel and requested reinstatement of his right to appeal which the court granted without objection. In this appeal, he claims that the evidence was insufficient to support his convictions as to his assaults on the children for various reasons which will be summarized following the factual history. *Appellant's Statement of Matters Complained of on Appeal* pursuant to *Pa.R.A.P. 1925(b)*.

The Commonwealth's first witness was [L.M.], who testified that, when she was living with her mother, [] Marsett, her younger sister, [M.M.], and brother, [A.M.], and was about eight or nine years old, her mother started dating the defendant, and about a year later he moved into their home. *Notes of Testimony, Trial (Waiver) Volume 1, September 8, 2011, pp. 29-32.* In the beginning, her relationship with the defendant had been like father-daughter and he would treat her nice and provide for the family, but after awhile, whenever she misbehaved, he would beat her on the legs and back with a belt causing bruises and on her hands with the back of a brush causing them to swell and sting. *Id., pp. 32-6.* She also observed him give similar beatings with like results to her sister, which occurred many more times than hers and more than twice a month, and for which they had to put on shorts and a sleeveless shirt, and beat her b[r]other with a belt causing welts and punch him in the chest. *Id., pp. 37-42.* That behavior had begun about a year after he moved in, and later he also began exhibiting a controlling and abusive relationship with her mother by hitting her and preventing her from doing things by herself, noting that "We didn't really get to see our family a lot." *Id., pp. 43-4.* As time went on those abuses, slapping her face, choking and arguing with her, became more frequent. *Id., pp. 45-6.*

[Footnote 3] 2746 EDA 2012. In its Pa.R.A.P. 1925(a) opinion in that appeal,

this court only noted and addressed the fact that the defendant's *1925(b) Statement*, which simply stated that his trial counsel rendered ineffective assistance without more, lacked the specificity required by the rule and the issue should have been deemed waived.

When the defendant first moved in, he and her mother shared the front bedroom, her brother had the middle bedroom, and her [sic] and her sister and the defendant's one year old daughter shared the back bedroom. *Id., p. 47*. When she was about ten or eleven, the defendant's daughter was given the middle bedroom, her brother was made to sleep on the couch in the living room, and she moved into the basement to have a room of her own and to get away from her sister with whom she would often argue. *Id., pp. 47-9.* She then described in detail his sexually abusing her which started with excessive hugging and progressed to his rubbing his penis against her buttocks, breasts and vagina, at first with their clothing on but eventually without, and then to intercourse; the frequency gradually increased to a practically daily or nightly basis and often times occurred in the basement. *Id., pp. 51-63.* She never told anyone about it because she was afraid that her mother would get hurt, and she did not resist the defendant because she was afraid he would hurt her if she did. *Id., pp. 63-5.* In 2008, when she was thirteen or fourteen, they moved to a different home and the sexual abuse continued but less frequently. *Id., pp. 67-8.*[Footnote 4]

[Footnote 4] The testimony as to the living arrangements was elicited in anticipation of attempts by the defense to portray the sexual abuse as having been unlikely to have occurred in such a crowded environment.

One night in early November of 2008, at about 11:00 or 12:00 o'clock, the defendant sent her mother and her sister to a laundromat and tried to

assault her but she refused to let him and he never tried to do so again. *Id., pp. 68-9.* After that, his physical abuse of the mother became worse and more obvious and culminated in his throwing all of them out (the home they lived in before was owned by the mother but the new home was owned solely by the defendant); she never saw him again until the court proceedings. *Id., pp. 68-70.* She still did not tell anyone about the sexual abuse because she was afraid her mother would have an emotional breakdown. *Id., pp. 71-2.* Then in April or May of 2010, as a result of her sister and brother having exhibited hostility and anger at school, her [sic] and her mother, sister, brother, an aunt and school counselors attended a meeting with a group organized by "It Takes a Village"[Footnote 5] during which her sister and brother described the defendant's physical abuse; during an intermission, her aunt asked her in private whether the defendant ever did anything sexual to her, upon which she started crying and then disclosed everything when the meeting resumed. *Id.*, pp. 72-7. It was reported, and she gave a statement to the police on May 4th. *Id., pp. 77-80.*

> [Footnote 5] Later described as an organization that conducts a practice called family group conferences or family group decision making.

The Commonwealth then called [M.M.] who described her relationship with the family and the defendant and their living arrangements as being, at first, much the same as her sister had described. *Id., pp. 98-101.* One day, when she was about eleven or twelve and had slept in her sister's bed with her, she awoke to find that her underwear was gone; the next night she awoke to find the defendant in her bed with her rubbing her vagina, and though it was dark and she kept her eyes closed she could sense that it was him.

> One night I woke up and my underwear wasn't on. And then the next night I had

felt -- I felt Tyree -- I had felt him, like, just rubbing on me. And I just laid there. The next day -- then afterwards he walked out the room. But I know my mom touch from -- like I told you earlier, I know my mom touch from his touch and everybody touch, so I knew it was him. I knew it wasn't nobody else. I knew it was him.

*Id., pp. 100-1.* She didn't tell her mother about it because she didn't think she would have been believed. *Id., pp. 101-9.* She further clarified her recognition of the defendant.

Because it's just -- like me and him -- I hugged him before. When I was little, I hugged him before. I shook his hand. It was like I know -- that's like if I touch you and somebody else touch. You would know my touch from me being around you so long. So I knew his touch. I knew what he felt like and all that. So it wasn't, oh, it was my mom or it was my brother. I know what his touch feel like.

*Id., pp 106-7.* She told her mother about those incidents after they attended the group meeting. *Id., pp. 109-11.* At the meeting, she told the group about the beatings, not being allowed to see her father, other family members, or friends, being made to wear Muslim attire, not being allowed to go outside and having to come right home from school and stay there.

. . . . he used to beat us. . . . That would occur every time we do something wrong, every time something wasn't basically his way. If -- like, every time the fishes -- one of the fishes would die, we all would get in trouble for the fish dying. Like there was probably, like, five fish, and every time one of them died,

everybody would get in trouble because the fish died. And if something went wrong, everybody got in trouble about it, not just one person. . . . -- it first began -- like, when he first started beating us, we used to have to put on T-shirts and shorts, and we would get a beating. We have to go down to the basement and bend over, and we'll get a beating. Then it turned out we had to put our hands on the bed, and if we moved then we got beaten longer. Then with me, . . . I used to have to stand up with my hands up in the air, and he used to beat me. And if my hands fall, I used to keep on getting a beating. And with the brushes -- that happened before the hands. We used to get hit on our hands with, like, the back of a wooden brush. . . .

*Id.,* pp. 114-15. She described him beating her with a belt on her back [and] buttocks and legs which would cause welts and purple bruises which she at one point showed to her "TSS worker" who took pictures and later asked the defendant about them but he denied causing them and nothing came of it. *Id.,* pp. 115-6. The beatings on the hands with the brush made her hands swell to the point that she couldn't close them; she would be beaten with the belt for fifteen minutes and then be made to stand with her hands in the air while he sat at the computer or PlayStation and be beaten again if her hands dropped, and how similar treatment was meted out to her sister and brother, and the latter being punched in the chest. *Id.,* pp. 116-9. She then described the final incident of him beating her mother causing her to bleed from the nose and mouth and their being thrown out. *Id.,* pp. 120-1. Anthony then testified to being beaten with a belt and brush and punched in the chest about once a month beginning when he was five years old, the defendant beating his sisters with the belt and brush, and seeing his mother with scars or bruises on her

face and legs after he had heard them arguing. *Id., pp. 143-50.*

[Mother] then testified to meeting and starting to date the defendant in 2003, his moving in with them with his daughter shortly thereafter, and their relationship being fine at first. *Notes of Testimony, Trial (Waiver) Volume 1, September 12, 2011, pp. 5-7.* After about two years, he began beating her and became increasingly controlling: ". . . I had to listen to everything he told me to do, you know, and I couldn't do anything without his permission. . . . like, go to the store or go see my mom or go see anybody in my family or anything like that." *Id., pp. 7-8.* She was required to where [sic] Muslim garments whenever she went outside, to be back after a specific time period, and to take her daughter [M.M.] with her. *Id., pp. 8-10.* In 2005, the defendant began beating her with a belt and choking her. *Id., pp. 10-11.* She then described one incident when, after her daughter [M.M.] left the house to go with her grandfather to visit her father, the defendant beat her severely with a belt all over her body and choked her causing purple, black and blue bruises on her legs, and another occasion where he hit her causing her to black out. *Id., pp. 11-16.* She testified that he would beat her from one to three times a month, that she didn't go to the hospital or tell anyone about it because she was afraid he would beat her for it and he threatened to harm her children if she did. *Id., pp. 17-19.* She described his hitting [A.M.] on the hands with a brush, "if one of his fish died or something like that", and his beating all of the children with a belt or brush leaving welts on their behinds and legs and their hands swelling to the point where they couldn't move them, and she wouldn't do anything for fear of his hurting her. *Id., pp. 21-7.* She then described the group meeting in much the same way as the children had (*Id., pp. 28-33*) and her and the children moving to his house and being thrown out; she continued to see him on occasion to try to work things out, but stopped doing so after the group

meeting when she found out what he had done to [L.M.]. *Id., pp. 34-5.*

The Commonwealth then called Ayesha Marsett, [Mother's] sister, who the[n] confirmed that after the defendant moved in with [Mother], she became cut off from the family in not speaking to them or attending family gatherings, would cover her face when she went anywhere, and, on occasion, would not answer the door when she went to her house, and, when asked why, would say that it was what she wanted to do. *Id., pp. 56-62.* She then described the group meeting in much the same way as the other witnesses. *Id., pp. 62-9.* The Commonwealth then called Marietta Brown-Sanders, the Philadelphia County supervisor for "It Takes a Village", who also described the meeting in much the same way, and, as required, filed a report of it with the Department of Human Services. *Id., pp. 74-82.* The prosecutor then submitted stipulations that, in essence:

> Nicole Heinz, would testify that in April of 2010 she was a parents ombudsman for the JL Kinsey School, which was attended by [A.M.] and [M.M.], that in her position, she made a referral to It Takes a Village to address behavioral issues they were having at school and was present during the group meeting on April 24th.

> Dr. Laura Brennan would testify that she is the attending physician on the suspected child abuse and neglect team in the division of general pediatrics at Children's Hospital of Philadelphia, that as an expert in child sexual abuse and after having reviewed the medical records of [L.M.], who was evaluated by the CHOP Care Clinic on June 15, 2010, for a medical evaluation of child sexual abuse and had a full physical examination, and would state: "Our

impression is that [L.M.] is a 16-year-old female with a disclosed history of sexual abuse [and] Her examine [sic] is normal today, which neither proves nor disproves the reported history of sexual abuse [and] that the history was provided by Ms. Marsett, meaning the mother, [], as well as [L.M.], in private sessions."

*Id., pp. 84-6.* The Commonwealth then rested.

The only defense fact witness was the defendant's mother, who testified that on some unspecified number of occasions between April 24 and May 4, 2010, while she was staying over [at] her son's house, [Mother] would come in and go upstairs with him and that sometimes they would play games and sometimes be intimate which she could tell because she could hear the noise through the floor. *Id., pp. 89-90.* That was simply an attempt to discredit [Mother] by showing that she continued the relationship. She then testified that, although she could not be sure, to the best of her knowledge, [L.M.] did not sleep in the basement at either residences [sic][Footnote 6], and that the defendant's reputation in the community for being a peaceful and law abiding citizen was very good. *Id., pp. 90-1.* On cross, the prosecutor established that the witness could not recall any specific dates when [Mother] came over to the defendant's house, nor even be sure whether she was there between April 24th and May 4th, that she only came there twice over the course of one week, and that she never stayed overnight at [Mother's] house. *Id., pp. 92-6.* The defense then called two of the defendant's sisters and friends, a brother, an aunt, and [his] "play" uncle, all of whom also testified that his reputation in the community for being a peaceful and law abiding citizen was very good, and then rested. *Id., pp. 97-104.*

[Footnote 6] Of course, [L.M.] never testified that she slept in the basement

at the defendant's house, only at her mother's.

Trial court opinion, 4/8/15 at 1-8.

Appellant raises the following issues for our review:

1. Was the evidence insufficient to support [appellant's] conviction for indecent assault where the alleged victim did not see who was supposedly assaulting her, thus requiring the factfinder to guess as to [appellant's] guilt?

2. Was the evidence insufficient to support [appellant's] convictions for endangering the welfare of a child, where the physical punishment he allegedly inflicted did not violate a duty of care, protection, or support?

Appellant's brief at 4.

Both of appellant's issues relate to the sufficiency of the evidence. When reviewing a sufficiency of the evidence claim, we are held to the following standard:

In reviewing the sufficiency of the evidence, we view all evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable [the fact finder] to find every element of the crime beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty."

Moreover, when reviewing the sufficiency of the evidence, this Court may not substitute its judgment for that of the fact finder; if the record

> contains support for the convictions, they may not be disturbed.

***Commonwealth v. Stokes***, 78 A.3d 644, 649 (Pa.Super. 2013), ***appeal denied***, 89 A.3d 661 (Pa. 2014) (citations omitted).

In the instant case, after reviewing the evidence presented, cast in the light most favorable to the Commonwealth, as verdict winner, we find that the evidence is sufficient to warrant the trial court's convictions for indecent assault and endangering the welfare of children.

In appellant's first issue, he avers that the evidence was insufficient to warrant a conviction of indecent assault.[1] In order to obtain a conviction for indecent assault, the Commonwealth must prove beyond a reasonable doubt that the defendant had "indecent contact with the complainant or causes the complainant to have indecent contact with the [defendant], and . . . the complainant is less than 13 years of age." 18 Pa.C.S.A. § 3126(a)(7).

This court has previously held that the uncorroborated testimony of a victim of a sexually based offense is sufficient to uphold a conviction, so long as the trier-of-fact believes the testimony. ***Commonwealth v. Trippett***, 932 A.2d 188, 194 (Pa.Super. 2007), citing ***Commonwealth v. Charlton***, 902 A.2d 554, 562 (Pa.Super. 2006). A fact-finder is free to believe all, part, or none of the evidence presented, including uncorroborated

---

[1] The trial court convicted appellant of two counts of indecent assault--one with L.M. as the complainant and one with M.M. as the complainant. Appellant only contests the conviction relating to M.M. in the instant appeal.

testimony. ***Commonwealth v. Mosley***, 114 A.3d 1072, 1087 (Pa.Super. 2015) (citations omitted). Therefore, how much credibility and weight is given to uncorroborated testimony is fully within the exclusive purview of the fact-finder.

In the instant case, the trial court heard M.M.'s uncorroborated testimony regarding one specific encounter with appellant. Appellant avers that M.M. did not actually see who allegedly assaulted her, and, therefore appellant's conviction was based on the trial court's guess that appellant assaulted her. (Appellant's brief at 9.) The trial court, functioning as the fact-finder in this case, made the following credibility determination:

> [M.M.'s] testimony, together with the fact that [appellant] was the only adult male living in the house, was sufficiently credible and consistent to allow a factfinder to believe its accuracy and the mere fact that she kept her eyes closed did not render her testimony so unreliable as to make the verdict based thereon pure conjecture.

Trial court opinion, 4/6/15 at 10. Based upon the trial court's finding that M.M.'s testimony was credible, her uncorroborated testimony is sufficient evidence to warrant appellant's conviction of indecent assault, pursuant to ***Trippett***. Therefore, appellant's first issue is without merit.

In appellant's second issue for our review, he avers that the Commonwealth failed to present sufficient evidence to warrant a conviction for endangering the welfare of children ("EWOC"). EWOC is defined as, "[a] parent, guardian, or other person supervising the welfare of a child under

18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection, or support." 18 Pa.C.S.A. § 4304(a)(1). This court has established a three-part test for determining whether the elements of EWOC have been met:

> (1) the accused was aware of his duty to protect the child; (2) the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare; and (3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare.

*Commonwealth v. Bryant*, 57 A.3d 191, 197 (Pa.Super. 2012) (citations omitted).

Here, the trial court convicted appellant of EWOC in regards to all three children--L.M., M.M., and A.M. Appellant avers that he was acting within his privilege of a parental figure by physically disciplining the children. (Appellant's brief at 11.) Based upon the children's testimony, the Commonwealth proved all three elements of EWOC beyond a reasonable doubt.

First, as to all three children, appellant concedes the first element under *Bryant*. He admits that "it is undisputed that [appellant] was seen in a parental role while living with the children." (Appellant's brief at 12.) We will first address appellant's EWOC convictions as they related to L.M. and M.M. In *Bryant*, the jury convicted the defendant of indecent assault and EWOC. The defendant raised a sufficiency of the evidence challenge,

averring that he did not owe the victim a duty of care. ***Byrant***, 57 A.3d at 197. The ***Bryant*** court held that "there was sufficient evidence for the jury to find that [the defendant] owed a duty of care to [the victim] and violated that duty when he sexually abused her." ***Id.*** at 199.

Here, appellant was convicted of two counts of indecent assault--one count in which L.M. was the complainant, which appellant did not contest, and one count in which M.M. was the complainant, which we addressed ***supra***. Therefore, we find that based on this court's decision in ***Bryant***, appellant's convictions of indecent assault, in which L.M. and M.M. were both victims, are sufficient to warrant convictions for EWOC.

We shall now address appellant's conviction for EWOC in which A.M. is the victim. In regards to A.M., appellant avers that he was exercising his parental privilege to exercise corporal punishment. (Appellant's brief at 11.) Specifically, appellant claims that his EWOC convictions should be set aside because, "[t]here is no evidence that the punishment caused death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation." (***Id.*** at 12.)

When it found appellant guilty of EWOC regarding A.M., the trial court made the following statement on the record:

> I find [appellant] guilty of charge number one, endangering the welfare of a child. I don't necessarily think that there has been a crime committed in the nature of simple assaults or possessing instruments of crime vis-à-vis the child for the discipline that was in question here. Though

I may have personal disagreements with the manner and intensity of the discipline, the Court is not the parent. The parents are still free to discipline their child unless it amounts to a serious offense. From what the children have been -- and the mother have [sic] defined to me, I do not see that it rises to a simple assault on each occasion or possessing instruments of crime. However, I do think that the frequency of it, especially the fish incidents, I think that is the type of atmosphere that results in what the law would describe as endangering the welfare by violating a duty of care, protection, and support, hence I issued the verdicts that I have done.

Notes of testimony, 9/12/11 at 124-125. We find that the record supports the trial court's conclusion that appellant violated his duty of care to A.M., and as a result, the Commonwealth presented sufficient evidence to warrant a conviction for EWOC.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2016